## THE ELLA ANDREWS.

### (Circuit Court of Appeals, Fifth Circuit. December 18, 1900.)

### No. 986.

1. COLLISION—NEGLIGENT NAVIGATION—LEAVING WHARF IN FOG.

   The mere fact that a tug left her landing opposite New Orleans to cross the river with a heavy tow during a fog did not constitute negligence which would render her in fault for a collision, where she observed the rules as to speed and signals, and took all proper precautions.

2. SAME—STEAM VESSELS—NAVIGATION IN FOG.

   A tug left her landing opposite New Orleans during a fog to cross the river with a tow laden with coal and a coal palace for loading the coal on a steamship. She observed the proper rules as to speed and signals. Almost immediately afterwards a second tug left an adjoining landing with a lighter tow, intending to take a course following the first tug, but she in fact took one which brought her across the course of the first tug, and came in collision with and sunk the coal boat being towed by the latter. She failed to give the proper signals on leaving the landing, and, on danger of collision becoming imminent, increased her speed, while the first tug stopped and reversed. *Held*, that the second tug was solely in fault for the collision, regardless of whether her failing to reverse was a fault under the circumstances.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

The present action is for the recovery of damages resulting from a collision which occurred in the port of New Orleans on the morning of February 6, 1899. The facts as alleged in the libel are as follows: "Shortly after seven o'clock on that morning the tug Maud Wilmot left the coal landing of libelants on the Algiers or right bank of the Mississippi river with a tow consisting of a coal boat laden with 7,702 barrels of Pittsburg coal and a coal palace. Both the coal boat and coal palace were made secure on the starboard side of the tug. The tug Maud Wilmot blew one long whistle, and started with said tow from said landing out into the river, quartering up the same and across the same, in order to avoid the swift downward current to get into the so-called eddy or up-stream current that reaches for a considerable distance from the New Orleans or left bank of the Mississippi river, in order to proceed with her tow up the river to the foot of Jackson street, where the steamship was lying which libelants were to coal. The Maud Wilmot started with said tow from the coal landing of libelants, which adjoins the coal landing of W. G. Coyle & Co., on the said Algiers side of the river, opposite the city of New Orleans. The tug Maud Wilmot, on leaving her landing, blew one long whistle. At the time the weather was moderately clear, and the tugs Maud Wilmot and Ella Andrews in plain sight of each other, but soon after a fog of considerable density shut in. The tug Maud Wilmot, with said tow, therefore proceeded with caution, at half speed, sounding the regular fog whistles. When the tug Maud Wilmot was well out in the river, say from two hundred and fifty to three hundred feet from the shore, and nearly opposite the landing of libelants, those on board heard one short whistle blown by the steam tug Ella Andrews, then at or near W. G. Coyle & Co.'s coal landing. That at once the Maud Wilmot blew one long whistle, and continued to blow the customary fog signals. That very shortly thereafter the lookout on top of the palace mentioned called out that the Ella Andrews was closing upon them, and thereupon and at once the engines of the Maud Wilmot were reversed at full speed, and the proper signals blown, and every effort made to avoid the threatened collision. That, instead of responding, the Ella Andrews rang one bell and blew two blasts of her boiler whistle as a signal for full speed ahead, and did come ahead at full speed, and immediately thereafter the

Ella Andrews struck with great violence, and collided with the coal boat and with the palace, tearing off the starboard plank side of said barge, causing same to fill with water, and, with the Pittsburg coal laden thereon, to sink, and become a total loss, and injuring the palace to the extent of seventy-five dollars." The Ella Andrews pursued her course without stopping to ascertain the injuries or to render assistance. The libel then charges that the Ella Andrews was out of her proper place in the river, and did not give the proper signal on leaving her landing; that she did not blow the fog signals as required by law; that she did not properly answer the signals of the Maud Wilmot; that the Ella Andrews, in giving the signal for and going ahead at full speed towards the starboard side of the Maud Wilmot and tow, instead of going to her port side, as she was in duty bound to do, and in persisting to cross and crossing the bow of the Maud Wilmot and tow, was guilty of culpable negligence, and disregard of the law and of the rules and regulations for navigating the waters of the Mississippi river; and that during all the time the Maud Wilmot was without fault, and was navigated strictly in compliance with law and the rules and regulations in such cases made and provided. Libelants claim that the steam tug Ella Andrews is liable to them for the loss and damage suffered by them, to wit, the value of the coal boat (named and styled "S. S. Crump, 1550"), $75; of Pittsburg coal laden thereon, $1,690.40; and the damages to said palace, $75.

The respondents' answer denies that on the morning of February 6, 1899, shortly after 7 o'clock, the time libelants allege the steam tug Maud Wilmot started with her tow from the coal landing of libelants, the weather was moderately clear, and the tugs Maud Wilmot and Ella Andrews in plain sight of each other, and that, soon after, a fog of considerable density shut in; but alleges specially that on the morning of February 6, 1899, at and before 6 o'clock on that morning, a dense fog had already shut in, and that said fog existed continuously from before 6 o'clock, and that at no time on said morning prior to the collision hereafter referred to were the tugs Maud Wilmot and Ella Andrews in plain sight of each other. The respondents deny that the Maud Wilmot proceeded with caution, at half speed, sounding the regular fog signals, as alleged in said libel, and that the tug Maud Wilmot was out in the river from 250 to 350 feet from the shore, and opposite the landing of the libelants, on the morning of February 6, 1899, when one short whistle was blown by the steam tug Ella Andrews, then at or still near W. G. Coyle & Co.'s coal landing, as alleged in said libel. The respondents allege that the steam tug Ella Andrews left the coal landing of W. G. Coyle & Co. shortly after 7 o'clock on the morning of February 6, 1899, having in tow on her port side a small coal flat; that on leaving said landing she blew one long whistle; that she immediately thereafter heard a fog whistle blown by the Maud Wilmot; that the Ella Andrews then responded by blowing the usual fog whistle, and immediately thereafter another fog whistle was blown by the Maud Wilmot, and that at that time the Ella Andrews was opposite the coal landing of W. G. Coyle & Co., about 100 to 150 feet from said landing, and was steering a southwesterly course up and across the river from the Algiers shore towards New Orleans, when the heavily laden coal boat which the Maud Wilmot had in tow crashed into and collided with the tug Ella Andrews; that the said collision occurred about half a minute after the tug Ella Andrews had left the coal landing of W. G. Coyle & Co. The respondents' answer further alleges that every effort was made by the tug Ella Andrews to prevent and avoid the collision without success; that the proper bells were rung by the tug Ella Andrews, her helm ported, but that the coal boat which the tug Maud Wilmot had in tow ran into, collided with, and struck the steam tug Ella Andrews on her starboard side, abaft of amidship, with great force and violence, knocking down one of the doors on said steam tug Ella Andrews, upsetting the kitchen utensils, chairs, lamps, oil, etc., leaving a part of her upper planking upon the deck of the steam tug Ella Andrews; and charges that said collision was caused and occasioned solely through the culpable negligence and fault of those in charge of the steam tug Maud Wilmot, and not through any fault or negligence of those in charge of the steam tug Ella Andrews. The respondents deny that the Maud Wilmot blew a long whistle

just prior to the collision, or that any signals except fog signals were blown, and deny that the Maud Wilmot made every effort to avoid the collision; that the Ella Andrews was on a course quartering down the river tending towards the New Orleans, or left, bank, but avers that at the time the steam tug Ella Andrews was in the act of leaving the coal landing of W. G. Coyle & Co., so as to take a course across and up the river with the coal flat which she had in tow, and which she intended towing and did tow to the steamboat landing on the left bank of the river. The respondents allege that the tug Maud Wilmot was guilty of culpable negligence, and was in fault in leaving the coal landing of libelants with a heavy tow in a dense fog, which had existed continuously for several hours prior to her leaving said landing, and which continued to exist for several hours thereafter; that, in consequence of said fog, at no time on that morning were the tugs Maud Wilmot and Ella Andrews in sight of each other; that the Maud Wilmot left her landing without giving the proper signals; that she did not blow the fog signals thereafter as required by law; that she was out of her place in the river, being in an eddy which runs close to the coal landing of libelants and W. G. Coyle & Co. on the Algiers shore, and which eddy, running at the rate of three to four miles an hour, accelerated to that extent the speed of the Maud Wilmot at the time of the collision, and that, if the Maud Wilmot had been in her proper place out in the river, the collision would have been avoided; that the collision occurred through the fault and negligence of those in charge of the Maud Wilmot, and their utter disregard of the law and of the rules and regulations for navigating the waters of the Mississippi river, and that said Maud Wilmot took no steps to avoid said collision.

From a decree condemning the Ella Andrews this appeal is prosecuted, and the following are the errors assigned: "(1) That the court was in error in finding the tug Ella Andrews to be at fault, and condemning claimant, William H. Crump, and William G. Coyle, surety on the release bond, in solido to pay to libelants damages as claimed in the libel filed herein. (2) That on the morning of February 6, 1899, the date when the collision occurred, referred to in the libel and answer, a dense, thick, heavy, and unusual fog prevailed; that it existed continuously for some time prior to the collision, and existed continuously for some time afterwards; that it was not only a dense and continuous fog, but was general, prevailing or existing on both sides of the river and in the middle of the river; that such was the condition of the weather at the date of the collision; that libelants' tug, the Maud Wilmot, left her landing first, led the way into the obscurity of the fog, and libelants, having thus voluntarily encountered the hazards of the navigation, should bear the loss sustained, and that the court erred in holding otherwise. (3) That the law requires in a collision case that the libelants must show the alleged negligence by a fair preponderance of evidence, which we respectfully submit does not exist in the instant case, and the court erred in not dismissing the libel. (4) That libelants' loss was occasioned by and resulted directly from the utter disregard which libelants and their tug the Maud Wilmot had for the safety of the property which she had in tow on the morning of the collision, February 6, 1899. That the court erred in not holding libelants guilty of gross and culpable negligence and fault in permitting, and ordering their tug to proceed on that morning with a heavy tow consisting of a coal boat laden with over 7,000 barrels of coal and a coal palace, in a dense, thick, continuous, and uninterrupted fog, and a decree should have been rendered herein dismissing the libel. (5) The rules of navigation are intended solely for the prevention of collisions; that when the observance of a certain rule in a particular case would not have prevented a collision, the nonobservance of such rule becomes immaterial; that the law is settled that, after two vessels have approached each other so near that a collision has become inevitable or imminent, the master of either may, in the exercise of a sound judgment, put his engines at full speed with a possibility of escaping contact or of easing the blow. (6) That there is error in the decree of this honorable court in not dismissing the libel filed herein, the collision not being attributed to any fault or negligence of the tug Ella Andrews. (7) That in the instant case the tug Ella Andrews was not equally in fault with the tug Maud Wilmot in running in a thick,

dense fog. She was a more powerful tug than the Maud Wilmot, and had a very light tow,—light coal flat containing only about 700 barrels of coal,—and the case is not one even, under the law, where damages should be apportioned or divided. (8) That the court erred in not finding the tug Maud Wilmot solely in fault for having proceeded with her heavy tow on the morning of the collision, and should have rendered a decree dismissing the libel. (9) That the decree herein is otherwise contrary to the law and the evidence."

Horace E. Upton, for appellant.

Chas. S. Rice and R. B. Montgomery, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts). The coal yard of Wilmot & Co. is on the Algiers bank of the Mississippi river, and occupies a space on the river front of about 400 feet. The coal yard of Coyle & Co. is just above and adjoining. On the morning of the 6th of February, 1899, at about 7 o'clock, the tug Maud Wilmot, with a coal boat containing about 8,000 barrels of coal and a coal palace, which is an elevated floating structure used in transferring coal from coal boats, started out from the Wilmot yard. The coal boat was fastened on the starboard side of the tug, and the coal palace was on the starboard side of the coal boat, but, being much shorter, was fastened well astern. The destination was a landing up the river on the New Orleans side, and the course taken by the tug was up and quartering across the river; compass course, S. W. ½ W. Just after the tug Maud Wilmot, with her tow, left the Wilmot yard, the tug Ella Andrews, with a coal barge in tow on her port side, left the Coyle yard for her destination on the New Orleans side about five blocks down the river. The master of the tug Ella Andrews testifies that his course was a southwesterly course, that would take him quartering up the river a little. Very shortly after the Ella Andrews left her landing the starboard side of the Ella Andrews collided with the starboard bow of the coal boat in tow of the Maud Wilmot, inflicting some little damage to the Ella Andrews, sinking the coal boat, and inflicting some slight damage to the coal palace of the same tow. This collision occurred within a short distance of the Algiers shore, not over 300 or 400 feet out in the river. At the time of the collision the Maud Wilmot, with her tow, was headed up the river, and nearly straight. It follows that the Ella Andrews and her tow which collided with the starboard bow of the coal boat must have been headed down the river. It thus seems that, immediately after the Wilmot left her landing, the Ella Andrews rounded out from the landing just above, ahead, and in front of the Maud Wilmot, each tug heading across, quartering the river, towards its destination; the Maud Wilmot up and the Ella Andrews down the river. The weather was foggy,—in the main, densely foggy; but, to reconcile the evidence of all the witnesses, there must have been occasional lifts or rifts in the fog. There is no doubt that between 6 and 7 o'clock that same morning the Maud Wilmot had made a successful tow to the New Orleans side of the river, and from the evidence of the captain and other witnesses the fog must have been more dense in some places than others; was shift-

ing in density, and sometimes lifted on the New Orleans side and remaining thick on the Algiers side, and vice versa. The master of the Wilmot testifies that when he left the landing he could see the Ella Andrews above at her landing a distance of 200 or 300 feet, and he testifies that before he started and from thenceforward he gave all the signals required by the rules of navigation and the circumstances of the case. It is by no means clear, under the evidence, that the Ella Andrews, before leaving the landing, gave the necessary signal required by the rules of navigation under such circumstances. The evidence is conflicting as to whether she gave a short whistle, or "toot," or a long whistle, required by the rule. After leaving the landing, she probably did give all the fog signals. When the close proximity of the two boats was discovered, the master of the Maud Wilmot gave the required signal to pass to the starboard. The evidence does not show that this signal was answered by the Ella Andrews. Immediately thereafter the Ella Andrews came in sight, and the master of the Maud Wilmot followed the rules, reversed his engines, and backed his tug at full speed. At this juncture the master of the Ella Andrews, instead of stopping and backing his tug, proceeded full speed ahead. It is proper to say in regard to this that the master of the Ella Andrews testifies as follows: "The only course that I pursued, knowing we had headway on our boat, I ordered full speed ahead, and kept on trying to clear the tow. That was my only hopes of avoiding a collision. Stopping and backing would have done no good at all, sir; not in the position that we were in." Considering that at the time the Ella Andrews and her tow, instead of being headed up stream quartering across the river, as the master supposed, was really headed down stream under steerageway, and moving with the additional force of the current, and that it would have been very difficult, if not impossible, to have stopped the headway of the Ella Andrews in time, there may have been a chance that by driving ahead the bow of the towboat would have been passed in safety. In fact, as the collision occurred, it was with the outside bow of the towboat and the side of the Ella Andrews amidship. A little quicker action and more headway might have averted the collision. If this were the only fault chargeable to the Ella Andrews, it might be considered a fault in extremis, not directly causing the collision, and the Ella Andrews exonerated. In the record is a large mass of evidence, direct, indirect, and more or less expert. From the careful examination we have given it, we find that the preponderance is in accord with the finding of the lower court that the Maud Wilmot was not in fault, and that the Ella Andrews was in fault. The only fault charged against the Maud Wilmot is that she proceeded with a heavy tow, consisting of a coal boat laden with over 7,000 barrels of coal, and a coal palace, "in a dense, thick, continuous, and uninterrupted fog," and thus voluntarily encountered the hazard of being run down. We do not find from the evidence that the fog was "dense, thick, continuous, and uninterrupted," but, if it were, we are unable to hold that the Maud Wilmot had not the right to proceed about her business, observing the rules of navigation, and otherwise taking all precautions for the safety of other

vessels as well as her own. The Ella Andrews, immediately following the Maud Wilmot, ran out into the same fog, rounding out just ahead of the Maud Wilmot, and did not observe the rules of navigation, or take the precautions necessary and proper for the safety of other vessels. The Ella Andrews was in fault in so soon following the Maud Wilmot after she left the landing; in not giving the signals required by the rules before she left the landing; because her master did not know, as he should have known by his compasses, that he was not pursuing the course which he says he intended, and which would have followed the Maud Wilmot, instead of heading her off; and in fault (perhaps minor) in not reversing his engines and backing as soon as he found he was approaching dangerously close to the Maud Wilmot and her tow.

The first assignment of error is too general to merit attention. The second assignment of error is not well taken, because, if the facts averred are true, the proposition that, because the Maud Wilmot left her landing first, the Ella Andrews might disregard all rules, and run her down without responsibility, is decidedly unsound. The third assignment of error, relating to the preponderance of evidence, has been disposed of, as well as the fourth, which questioned the right of the Maud Wilmot to commence her voyage in a fog with a tow of 7,000 barrels of coal. To the fifth assignment of error we agree thus far: that the rules of navigation are intended for the prevention of collisions, and that, when the observance of a certain rule in a particular case would not have prevented a collision, the nonobservance of a set rule becomes immaterial, provided the vessel is otherwise without fault. As noticed above, if the only fault of the Ella Andrews had been in not reversing her engines and backing when approaching the Maud Wilmot, we might have excused her master from responsibility for the collision. The sixth assignment of error is general. The seventh and eighth, to the effect that the Ella Andrews was not equally in fault with the Maud Wilmot, are not well taken. The ninth assignment of error is general. On the whole case, we are of opinion that no reversible error is to be found, and that the decree of the district court should be, and it is, affirmed.